**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **NELLIE J. DAVIS,** | § |
| **PLAINTIFF,** | § |
| | § |
| **VS.** | § **CIVIL ACTION NO. 4:04-CV-384-Y** |
| | § |
| **JO ANNE B. BARNHART,** | § |
| **COMMISSIONER OF SOCIAL SECURITY,** | § |
| **DEFENDANT.** | § |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Nellie Davis brings this action pursuant to Section 405(g) of the Social Security Act,

Title 42 of the United States Code, for judicial review of a final decision of the Commissioner of

Social Security denying her claim for disability insurance benefits under Title II of the Social

Security Act.  Davis applied for disability benefits on November 15, 2001, claiming she has been

disabled since April 19, 2000 by head and neck pain.  (Tr. 78-79, 252).  Davis met the requirements

for disability insured status through December 2003.  (Tr. 250).

The Social Security Administration denied Davis's application for benefits both initially and

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 1**

on reconsideration.  Davis requested a hearing before an administrative law judge (the "ALJ"), and ALJ Ward D. King held a hearing on February 24, 2003 in Fort Worth, Texas.  (Tr. 28-52).  Davis was represented by counsel.  On July 11, 2003, the ALJ issued an unfavorable decision and found that Davis was not  disabled because she had the residual functional capacity (RFC) to perform her previous job as a file clerk.  (Tr. 13-18).   The Appeals Council declined Davis's request for review of the case, leaving the ALJ's decision to stand as the final decision of the Commissioner.  (Tr. 4).

B.  STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527.  Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations.  *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience.

*Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 3

C.      ISSUES

    1.      Whether the residual functional capacity (RFC) assessment is supported by

            substantial evidence.

    2.      Whether the determination that Davis can perform her past relevant work as a file

            clerk is supported by substantial evidence.

D.      ADMINISTRATIVE RECORD

    1.      Medical History

    Davis fell at work on April 19, 2000, injuring her neck and low back.  She sought care from

chiropractor Douglas Beman.  Beman performed chiropractic adjustments that helped Davis's

headaches and neck pain, but did not help her low back symptoms.  (Tr. 125).  Beman ordered

magnetic resonance imaging (MRI) studies of Davis's spine in November 2000.  The MRI of

Davis's cervical spine showed spondylosis[1] at C4-C5, C5-C6 and C6-C7 and a loss of disc space

height at these levels.  There was no evidence of touching or effacement of the cervical spinal cord.

(Tr. 94).  An MRI of Davis's lumbar spine showed  severe disc dessication at L2-L3 and minimal

effacement of the thecal sac at this level; post traumatic facet arthropathy[2] at L4-L5 and L5-S1; and

a disc bulge or protrusion at L5-S1 extending into the thecal epidural space without touching or

effacing the thecal sac.  (Tr. 96).

    Beman referred Davis to Jerry Gurkoff, D.O., for evaluation on November 16, 2000.

---

    [1] Spondylosis is a general term for ankylosis of a vertebral joint or degenerative spinal changes due to
osteoarthritis.  Dorland's Illustrated Medical Dictionary 1684 (29th ed. 2000).  Ankylosis refers to the immobility and
consolidation of a joint due to disease, injury or surgical procedure.  *Id*. at 91.

    [2] Arthropathy refers to any joint disease.  *Id*. at 152.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 4

Gurkoff reviewed the MRI studies and also performed a physical examination.  Gurkoff observed what he referred to as a pleasing range of motion in Davis's cervical spine, with some increase in sensation on the left as compared to the right.  (Tr. 99).  Davis's deep tendon reflexes were 2+ and equal bilaterally.  Motor testing of Davis's lower extremities demonstrated no gross weakness.  Straight leg raising on the left was unremarkable, but Davis expressed increased discomfort at seventy degrees on the right.  (Tr. 100). Gurkoff diagnosed cervical strain and sacroiliitis,[3] greater on the right.  There was no evidence of severe discogenic disease.  Gurkoff opined that conservative treatment measures should be continued because Davis was not a surgical candidate. (Tr. 100).

Davis also saw Alan B. Hurschman, M.D., beginning in February 2001.  (Tr. 103-30).  Davis demonstrated full range of motion and normal muscle strength in her upper and lower extremities.  Straight leg testing was positive, and lumbar range of motion was limited.  (Tr. 127).  Hurshman diagnosed cervical disc displacement, lumbar disc protrusion, post-traumatic headaches, and a resolving left ankle sprain.  He attributed these injuries to Davis's fall the previous year.  (Tr. 127).

Hurshman recommended pain injections to alleviate Davis's symptoms, but when these failed to provide relief, Hurshman administered a series of epidural steroid injections. (Tr. 105, 107-08).  These injections were partially successful, but provided only short-term relief.   (Tr. 39, 103).  During an appointment on May 22, 2001, Hurshman noted that Davis was experiencing marked anxiety symptoms and she complained of mood swings.  (Tr. 112).  Davis was released from Hurshman's care on September 25, 2001 with a recommendation that she be evaluated for surgery. (Tr. 103).

---

[3] Sacroiliitis is inflammation (arthritis) in the sacroiliac joint.  *Id.* at 1593.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 5

Davis saw neurosurgeon Carlos Acosta, M.D., for evaluation.  (Tr. 136). Acosta ordered electromyography (EMG) and nerve conduction studies, which showed no evidence of radiculopathy, myopathy, or neuropathy.  (Tr. 141-42). Although Davis had mild bulging discs and degenerative disc disease of her cervical spine, there was no evidence of herniation.  (Tr. 133). Acosta did not consider Davis a surgical candidate and discharged her from his care on February 7 ,2002.

As part of her workers' compensation claim, Davis was evaluated by chiropractor Todd Ruland, D.C., at MetroPlex Mobile Diagnostics on April 4, 2002.  (Tr. 222).  Sensory and reflex testing was within normal limits, but Davis exhibited significant weakness in her lower extremities. Range of motion was noted to be restricted in her cervical and lumbar spine.  Davis demonstrated lifting ability and cardiovascular fitness that fell within the sedentary to light range of exertion.  The evaluator opined that Davis could frequently sit, stand and walk.  (Tr. 224-25).

Davis was evaluated by Charles Murphy, M.D., as part of a worker's compensation claim. Murphy found that Davis had reached maximum medical improvement as of April 25, 2002 with a 10% whole person impairment based on injury to her lumbar and cervical spine.  (Tr. 191-98).

Davis saw John Milani, M.D., on May 8, 2002 for her complaints of lumbar pain.  (Tr. 204). Davis demonstrated a normal gait and no muscle spasms.  Range of motion in her lumbar spine was reduced by 50%.   Sitting straight leg testing was negative, but supine straight leg testing was positive on the right side.  (Tr. 206).  Milani assessed probable discogenic pain at L5-S1 and recommended a discogram[4] for insight about the source of Davis's pain.  (Tr. 208).

---

[4] A discogram is a radiographic study of an intervertebral disc.  *Id.* at 526.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 6

On May 21, 2002, Davis saw Bryan S. Drazner, M.D., for her ongoing low back complaints. (Tr. 201). Davis walked with a modestly antalgic gait, favoring her right leg. She was able to perform heel and toe walking. Straight leg raising elicited considerable pain on the right, and her range of motion was reduced to 50% of normal. Deep tendon reflexes were 2+ and symmetrical, and sensation was intact. Drazner diagnosed lumbar disc syndrome and cervical disc syndrome. He renewed Davis's prescription for Lortab and prescribed Ultracet for more moderate episodes of pain. (Tr. 203).

Davis underwent a consultative mental health evaluation with Samir Wahby, M.D., on June 5, 2002. (Tr. 163). Davis was taking Nexium for acid reflux disease, hydrocodone and muscle relaxants for back pain, Prozac, and Xanax. She reported being depressed for several years before her work injury. Davis reported crying spells, mood swings, a negative outlook, and panic attacks, and said she sometimes isolated herself from others. Davis informed Wahby that she had been hospitalized in 1999 for suicidal thoughts.

Davis had married and divorced four times. She stated that she lived with her father, and her daily activities consisted of watching television and cooking for her father. She reported that she cleaned the house, bought groceries, went to the mall, and talked on the telephone with a few friends. Davis's hobbies included ceramics and painting, and she sometimes went out to eat with her sister and her daughter. Davis showered daily and cared for her own basic needs. Her father assisted with the housework and did most of the laundry. (Tr. 164).

Davis made good eye contact during the interview and demonstrated average intelligence. She was oriented and denied any hallucinations. Wahby noted that Davis demonstrated a flat affect

with psychomotor retardation.  (Tr. 164).  Wahby diagnosed major depression and a panic disorder.

He opined that Davis had a poor prognosis because of chronic physical problems and chronic

depression that were "feeding into each other."  (Tr. 165).

> 2.      Administrative Hearing

Davis was born November 22, 1947.  She testified that she completed high school and had

obtained certification as a nurse's aide.  (Tr. 31).  Davis had most recently worked as a file clerk for

an insurance company, but stopped working shortly after falling at work.  (Tr. 35).  She saw a

number of doctors for her back and neck pain, and later developed acid reflux disease that prevented

her from having a myelogram because of a risk of aspiration pneumonia.  (Tr. 37-38).

Davis testified that the worst and most constant pain was in her low back and radiated into

her right leg.  (Tr. 40-41).  Narcotic pain relievers had helped somewhat, but she no longer used

narcotic medications.  (Tr. 41, 46).  Davis also described neck pain that radiated into her head and

shoulders, but the pain varied depending on her activity level.  (Tr. 42).

In addition to her back and neck complaints, Davis testified that she was taking Prozac for

depression and Xanax for treatment of anxiety attacks.  (Tr. 40).  Davis testified that she had

experienced crying spells and periods when she would isolate herself from others, and she did not

sleep well.  (Tr. 42-43).  She had also experienced substantial weight gain over the past few years.

(Tr. 43).  Davis testified that she was unable to handle stress, was not very sociable, and had anxiety

attacks that made her feel like she was dying.  Davis testified that her thinking was impaired and she

had to write down information if she wanted to remember it.  (Tr. 45).

Davis lived with her father, who was eighty-eight years old.  She testified that her father did

the laundry, vacuuming and cooking.  Davis testified that she was able to do the grocery shopping by herself, but because of discomfort, did not drive long distances and needed friends or family to driver her to her medical appointments.  (Tr. 46).  Davis estimated that she could stand or walk for about thirty minutes at a time.  (Tr. 47).  She did not consider her ability to sit to be much better than her ability to stand.

3.      ALJ Decision

The ALJ found that Davis had not engaged in substantial gainful activity since her alleged onset date and had severe medically determinable mental and physical impairments; however, her impairments failed to meet or equal any listed impairment.  (Tr. 17).  The ALJ further found that Davis's assertion of a total inability to work was not wholly credible, although she did have some exertional and nonexertional work-related limitations.  (Tr. 16-17).  Instead, the ALJ found that Davis could perform the full range of medium work, except she required jobs with a reasoning development level of 1, 2 or 3 as defined in the Dictionary of Occupational Titles (DOT).  The ALJ then considered Davis's previous work as a file clerk, which the DOT described as light work requiring a reasoning level of 3, and concluded that Davis's residual functional capacity did not preclude her from performing the demands of that job as customarily performed in the national economy.  (Tr. 17-18).  Accordingly,  the ALJ determined that Davis was not disabled or entitled to a period of benefits at any relevant time through the date of his administrative decision.  (Tr. 18).

E.      DISCUSSION

1.      Residual Functional Capacity

Davis asserts that the ALJ's assessment of her residual functional capacity is not supported

by substantial evidence.  She complains that the ALJ erred in relying primarily on the reports from the state agency physicians who reviewed her case because the state agency physicians did not have the benefit of the functional capacity evaluation she completed in April 2002.  Davis and the Commissioner agree that the functional capacity evaluation does not qualify as a medical source statement, but Davis asserts that the evaluation is composed of objective test results that are relevant to an assessment of his RFC.

The ALJ found his assessment of Davis's RFC was supported by the state agency physicians and agreed with the physicians' determination that Davis's impairments did not preclude all work activity.[5]  (Tr. 17).  But the ALJ also considered the results of the April 2002 functional capacity evaluation, which found Davis capable of lifting up to twenty pounds and sitting, standing or walking on a frequent basis.  The ALJ found that the evaluator's opinion that Davis had a fitness level[6] compatible with sedentary or light exertion had no bearing on the disability decision, and noted that the questionnaire Davis had completed for the functional capacity evaluation reflected more restricted activities than she had reported elsewhere.  (Tr. 17).

The ALJ reviewed Davis's medical history and the observations of treating medical sources who evaluated her neck and back injuries.  He conceded that Davis could be expected to experience

---

[5]  The state agency medical consultants who reviewed Davis's application for benefits initially and on reconsideration opined that she could lift up to twenty five pounds frequently and fifty pounds occasionally; sit for about six hours during a standard eight-hour workday; stand or walk for up to six hours during the workday; and had no postural limitations.  (Tr .144-50).  The non-examining state agency psychologist who reviewed Davis's mental impairments opined that Davis retained the ability to perform simple work activities, interact with others, and respond to changes.  (Tr .170).

[6]  The ALJ's reference is to a portion of the functional capacity report dealing with Davis's cardiac ability, not strength.  (Tr. 225).  Davis's concern that the ALJ treated the entire report as irrelevant to his determination is unfounded.

**Findings, Conclusions and Recommendation of the United States Magistrate Judge–Page 10**

mild to moderate back pain, but noted that a person need not be pain free to engage in substantial gainful activity. (Tr. 16). The ALJ also found that Davis described daily activities and social activities that were inconsistent with her assertions of disability and she managed these activities despite the combination of her physical and mental impairments. (Tr.16).

Davis has not demonstrated that the April 2002 functional capacity evaluation is a decisive measure of her ability to engage in work activity, nor has she demonstrated a lack of substantial evidence to support the ALJ's assessment of her residual functional capacity for a modified range of medium work activity.

2.      Past Relevant Work

Davis additionally complains that the ALJ erred in finding that she could perform the job of file clerk as that job is generally performed in the national economy. She reurges her complaints about the RFC determination, which have already been addressed, but also complains of inconsistencies within the ALJ's written decision.

There is a patent inconsistency in the ALJ's opinion that requires reversal and remand of the decision. In considering Davis's mental impairment, the ALJ determined that Davis retained the ability to perform the basic mental demands of competitive, remunerative, *unskilled* work. (Tr. 15). He further limited Davis to jobs with a reasoning development level of 1, 2 or 3 as defined in the DOT. (Tr. 15). But later in his opinion, the ALJ considers Davis's previous work as a file clerk and concludes that she can perform this light, *semiskilled* position. (Tr. 18).

The Commissioner does not address this inconsistency, but argues only that the work of a file clerk requires a reasoning level of 3 and is thus compatible with the ALJ's RFC assessment.

Reference to the DOT, however, indicates that skill levels and reasoning levels are separate concepts. *See generally* Dictionary of Occupational Titles at app. C (rev. 4th ed. 1991). The ALJ's determination that Davis can perform her past relevant work is unsupported by substantial evidence and inconsistent with the ALJ's own assessment of the work-related impact of Davis's mental impairments.

<u>RECOMMENDATION</u>

It is recommended that the decision of the Commissioner be reversed and remanded for further administrative proceedings consistent with these proposed findings of fact and conclusions of law.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until September 2, 2005. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or

**<u>Findings, Conclusions and Recommendation of
the United States Magistrate Judge</u>–Page 12**

manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until September 2, 2005 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED AUGUST 12, 2005.


        /s/ Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE

**<u>Findings, Conclusions and Recommendation of
the United States Magistrate Judge</u>–Page 13**